IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 36069-5-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| SANTIAGO ALBERTO SANTOS, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. (writing for the majority in all but Section VIII) — We affirm

Santiago Santos's conviction for second degree murder, but remand to vacate some

financial obligations.

FACTS

Santiago Santos appeals his conviction and sentence for the November 15, 2015,

killing of Manuel Jaime. Santos then lived with his mother in a Grandview house located

on the same street as the residence of Manuel Jaime. In November 2015, Santos worked

the night shift at a Prosser warehouse.

1

Because Santiago Santos claims diminished capacity, we recount some of his history and characteristics. According to Maria Santos, Santiago's mother, Santiago lived a different life. Santiago did not desire company, and he disliked sunlight to the extent he placed sheets over the home's windows. Sometimes Maria heard Santiago, alone in his bedroom, talking and laughing. Santiago occasionally told his mother that others sought to injure him, he housed a tumor in his head, he suffered internal bleeding, and he contracted a sexually transmitted disease from his girlfriend.

Medical records introduced as exhibits at trial showed that, in June 2014, Santiago Santos told medical providers: "'I think I have contracted a brain tumor. I am having pain inside my head.'" Ex. 206 at 8 (some capitalization omitted). The treating physician apparently questioned the self-diagnosis because the physician only diagnosed a headache and prescribed pain medication. In early July 2014, Santos returned to the hospital, where he informed medical providers that he engaged in intercourse with a female without protection and that he wanted treatment for symptoms resulting from a sexually transmitted disease. Records, however, list no diagnosis of a sexually transmitted disease. In August 2014, Santos went to the emergency room and complained of severe pain in his spleen. The emergency room physician diagnosed Santos with gastritis.

2

For two years before his death on November 15, 2014, Manuel Jaime, with a criminal record, worked for money as a confidential informant for a drug task force. The task force had recently employed Jaime to conduct a controlled buy of narcotics from an individual named "Fajardo." 7 Report of Proceedings (RP) at 623, 646-47. The buy led to Fajardo's arrest and prosecution.

We begin the facts of the slaying of Manuel Jaime from the perspective of ear witness, twelve-year-old Andrew Fernandez, a pseudonym. On November 14, 2014, Andrew, five siblings, and one cousin enjoyed a sleepover at Andrew's Grandview home. Andrew lived at the residence with his mother, grandmother, and uncle, Manuel Jaime. That evening, Andrew's mother worked a night shift, and his grandmother visited Texas.

Appellant Santiago Santos had seen, before November 14, 2015, children playing in Manuel Jaime's yard. He knew Andrew Fernandez and other children lived in the home. Santos testified at trial:

> They stayed there and lived there. It's obvious. It's obvious.

9 RP at 910.

Andrew Fernandez fell asleep around 9:00 p.m. and awoke shortly before 3:00 a.m. Andrew heard a loud thump as if something fell to the ground. He then heard his uncle, Manuel Jaime, crying. While Jaime sobbed, Andrew heard a voice, which he recognized as Santiago Santos's voice, say "you're dying slowly. I told you I was going

3

to do this." 5 RP at 383. Andrew knew Santos from earlier contact. Santos told Jaime

that Jaime owed him something, while Santos mentioned the name "Fajardo." 5 RP at

383.

Andrew Fernandez panicked, awoke the other sleeping children in the room, and

tried to open the bedroom window. The window would not open. Minutes later, a

frightened Fernandez retrieved his phone from his backpack and called law enforcement.

Fernandez told the 911 operator that someone was harming his uncle, and he asked for

help.

According to Andrew Fernandez, Santiago Santos used the residence's restroom

next door to the room in which the children had slept. Santos returned to the room in

which Manuel Jaime lay, and remarked: "I'm going to come back for your family."

5 RP at 383.

When officers arrived at the Grandview residence, they found Manuel Jaime lying

near the front doorway of the home and bleeding profusely. While fearing the culprit

might flee from the residence, Grandview Police Officer John Arraj circled the house and

observed a man, later identified as Santiago Santos, through a bedroom window. Officer

Arraj illuminated Santos with his flashlight, and Santos immediately drooped to the floor.

Arraj returned to the residence's doorway, entered the abode, and hurried past a bloody

4

Jaime. Arraj found Santos lying face down with his fingers interlaced behind his head. Officer Arraj secured Santos in handcuffs and escorted him from the home.

Officer John Arraj swept the house for more victims and found the seven children inside a bedroom. Officer Arraj instructed the youths to stay inside the bedroom, and he closed the door. Officer Arraj and other officers then provided medical aid to Manuel Jaime. Jaime suffered from numerous stab wounds, puncture wounds to his chest, and a large incision in his abdomen. Officers heard sucking noises. Jaime pled with officers: "let's go; let's go; let's go." 5 RP at 448. Officer Arraj concluded that Jaime would likely die from blood loss, so Arraj asked Jaime who stabbed him. Jaime replied: "Santiago." 5 RP at 449. Officer Arraj asked a second time, and Jaime answered again: "Santiago." 5 RP at 449. Officer Arraj questioned: "Santiago who's in the house?" 5 RP at 449. Jaime responded yes. 5 RP at 449. Andrew Fernandez overheard the officers questioning his uncle Manuel Jaime, and the twelve-year-old heard his uncle say "Santiago." 5 RP at 387-88. Medics transported Jaime to the hospital, where he perished less than one hour later.

Grandview Police Officer Jose Martin assisted at the crime scene. In a bedroom closet, Officer Martin found a bloody folding knife located on top of a stack of books.

5

Officer John Arraj transported Santiago Santos to the Grandview Police Department. He collected Santos's clothing and took photographs of Santos while in his cell. Santos wore four sets of underwear. Santos bore blood on his hands, clothing, and boots. Officer Travis Shepard assisted Officer Arraj in evidence gathering and found blood on Santos's arms and shoulders. The officers took blood swabs from various parts of Santos's body.

After leaving the jail cell, Officer John Arraj realized he mistakenly left the camera in the jail cell. When Arraj returned to the cell, he found the camera placed in the cuffing port of the cell. Santiago Santos remarked to Arraj: "you left something behind." 5 RP at 453. Officer Arraj discovered the camera's memory card missing and the photos of Santos deleted. During his contact with Santos, Officer Arraj never smelled intoxicants.

Police officers took the children sleeping at the Grandview home with Andrew Fernandez to the Grandview police station. Alma Guillen, Manuel Jaime's sister and Andrew Fernandez's aunt, retrieved her ten-year-old daughter and the six other children from the station. She found her daughter in tears, distraught, and fearful. According to Guillen, her daughter, the daughter's cousins, and Guillen herself thereafter "had problems" returning to the Grandview home.

Later during the morning of November 15, 2014, officers served a warrant on Santiago Santos in order to swab his mouth for DNA. Detective Mitchell Fairchild audio and video recorded the interaction. Officers also sought to interview Santos.

Before questioning Santiago Santos, Detective Mitchell Fairchild read Santos the *Miranda* warnings. In reply, Santos requested an attorney. Officers ceased all questioning of Santos and served the warrant. Detective Fairchild read the DNA search warrant in its entirety to Santos. The warrant read, in part, that the DNA evidence was "material to the prosecution of homicide the result of the death of Manuel Ezequiel Jaime." Ex. 208 at 1. Fairchild asked Santos if Santos understood the warrant. Santos sat silent. Fairchild requested that Santos swab the inside of a cheek. Santos remained momentarily quiet. Then Santos commented: "I don't see no signature of no judge on this." Ex. 208 at 2. Detective Fairchild explained that he had garnered the warrant telephonically. After a colloquy concerning the validity of the warrant, Santos swabbed his mouth.

Jeffrey Reynolds, a forensic pathologist, performed an autopsy on Manuel Jaime. Dr. Reynolds counted 59 stab wounds and an unspecified number of smaller superficial injuries. Nearly all wounds were above the waist, with most being on Jaime's back and sides of the chest. A severe wound to Jaime's abdomen exposed some internal organs. To his surprise, Reynolds found no defensive wounds. Dr. Reynolds concluded that

7

Jaime bled to death. The autopsy also revealed that Manuel Jaime had more than one

milligram per liter of ketamine in his system at the time of death.

Law enforcement sent the blood stained knife found in the Grandview residence

to the Washington State Patrol Crime Laboratory, where forensic testing revealed a

fingerprint matching Santiago Santos's print. The testing also detected the presence of

Manuel Jaime's blood. The laboratory also confirmed the presence of Manuel Jaime's

DNA on Santos's shirt. The laboratory never completed a DNA analysis of the buccal

swabs from Santos's mouth.

Law enforcement officers interviewed Andrew Fernandez on the day of the

slaying. Officers also interviewed Andrew on another unidentified day. By the time of

the later interview, Andrew had calmed down. Still, a school counselor attended the

interview with Andrew to provide him support.

PROCEDURE

The State of Washington charged Santiago Santos with murder in the first degree

and, in the alternative, murder in the second degree. The trial court ordered a competency

evaluation of Santos and later conducted a competency hearing. The court entered an

order finding Santos competent.

The trial court conducted a CrR 3.5 hearing to determine the admissibility of two

statements made by Santiago Santos while in custody: (1) Santos's statement to Officer

John Arraj that "you left something behind," 2 RP at 30, in reference to the camera; and (2) Santos's observation to Detective Mitchell Fairchild that "I don't see no signature of no judge on this [warrant]." 2 RP at 66; Ex. 208 at 2. The State sought to introduce the statements only in rebuttal if Santos testified. The State contended that officers did not solicit the statements and the statements showed Santos's mental acuity in the event Santos asserted diminished capacity when attacking Manuel Jaime. Defense counsel advocated suppression of Santos's second statement because Santos earlier invoked his right to an attorney, but law enforcement continued to question him.

The trial court denied suppression of Santiago Santos's statement about Officer John Arraj leaving behind the camera because no police questioning prompted Santos's remark. The court also denied suppression of the comment of the absence of a judge's signature on the warrant because the remark did not respond to any question.

Before trial, the State moved in limine to exclude any reference to homosexual conduct or advances between Manuel Jaime and Santiago Santos. Because the autopsy of Jaime found ketamine in his system, defense counsel sought to present testimony that the gay male population uses ketamine to enhance sexual pleasure. Defense counsel explained that the evidence would show that the stabbing began in Manuel Jaime's bedroom and, according to Andrew Fernandez, Santiago Santos and Jaime were best friends. Santos's counsel further explained that a defense expert would testify that a

9

sexual advance by Jaime may have provoked a violent response by Santos, while in a delusional state. The trial court granted the State's motion to exclude reference to homosexual activity unless the defense presented evidence of homosexual activity related to the killing of Manuel Jaime.

During trial, then sixteen-year-old Andrew Fernandez testified to what he heard during the early morning hours on November 15, 2014. Fernandez avowed that he recognized Santiago Santos's voice from Santos's previous visits to the home. Fernandez also recalled seeing Santos on November 14, 2014 at a Safeway grocery store.

The State played for the jury Andrew Fernandez's 911 call. Before playing the audio, the court and the parties discussed the content of the call and determined that a transcript would also be admitted. The State also played the video of the interaction between Detective Mitchell Fairchild and Santiago Santos concerning the warrant for the DNA swab. The trial court admitted the transcript of the duo's conversation as an exhibit during the State's rebuttal.

Forensic Pathologist Jeffrey Reynolds testified about his autopsy on Manuel Jaime. When the prosecution showed Dr. Reynolds the murder weapon, Reynolds opined that the injuries he observed on Jaime were consistent with the design of the knife since the knife had only one sharp edge, lacked any serrations, and lacked a hilt.

During trial, Dr. Jeffrey Reynolds mentioned ketamine's presence in Manuel Jaime's blood. Dr. Reynolds explained that, when a person uses ketamine, his brain and body do not communicate to each other. Ketamine renders a person's motor skills useless. The finding of ketamine explained the lack of defensive wounds because of Jaime's inability to react to the stabbing.

Before defense Forensic Toxicologist Chris Johnston took the stand, defense counsel renewed a request to ask Johnston about the unusual properties of ketamine and its purported use in the homosexual population to enhance or tolerate sexual activity. The trial court confirmed its earlier ruling excluding the evidence.

Toxicologist Chris Johnston testified to some of the effects of ketamine on a person. Medical professionals employ the sedative drug during surgery. Others use ketamine recreationally for relaxation and hallucinogenic effects. According to Johnston, the drug severs the connection between the head and the body such that the head does not register pain from the body.

Santiago Santos testified at trial on his behalf. Santos denied knowledge of who killed Manuel Jaime or the purpose of Jaime's murder. Santos claimed a diagnosis of "acute paranoid schizophrenia." 9 RP at 881. He characterized the world as a dangerous place. He rejected a belief that others sought to harm him, but admitted that he carefully guards his safety. Santos refuted his mother's testimony that he blanketed the windows at

11

home to block all light. Santos testified that he blocked the sunlight only after he contracted a sexually transmitted disease in 2013. When asked about his mother's testimony that he sat in his room and talked to himself, Santos explained:

> Thinking is different. People would think and just theorize on their own. It doesn't mean one's talking to themselves they're in a mentally crazed state. People think all the time. It doesn't mean that they're crazy. It's just thoughts. It's no different than talking. It's just thoughts.

9 RP at 883.

Santiago Santos testified that he once believed he suffered from a brain tumor because his head felt radioactivity from the sun, but he conceded to his error in the diagnosis. Santos believed he was bleeding internally because he engaged in violent fights and had been shot with large rubber bullets.

Santiago Santos testified about his life from childhood to the time of the murder. In 2012, he moved from California to Grandview and worked in the apple orchards before working in the wine industry as a forklift operator. Sometimes after finishing a shift, Santos and his cousin frequented bars, dance places, and casinos.

Santiago Santos testified that, on the night of Manuel Jaime's death, Santos imbibed at a bar in Prosser, where he consumed blue-colored Long Island iced teas, eight beers, and four or five shots of liquor. When asked whether the bar continued serving him after he consumed all of those drinks, Santos responded:

12

> I'm able to drink a lot before I get really drunk. At the time I was still consciously aware of how many drinks I was consuming. However, I didn't keep count. I just keep drinking and drinking and drinking.

9 RP at 902. Santos did not remember where he went after leaving the tavern. Nevertheless, he remembered walking past Manuel Jaime's home and Jaime's opening of a side door and inviting him inside. Santos knew Jaime since childhood, and the two never had a dispute.

Santiago Santos did not remember events that occurred inside Manuel Jaime's home. Santos declared:

> Something could have happened. I don't know what that is. It's a strange thing. I'm trying to figure out what happened myself.

9 RP at 891.

Santiago Santos testified to being struck in the back of the head. The testimony did not identify the time or place of the blow, but one might conclude that Santos believed someone hit him while he was inside Manuel Jaime's home. Nevertheless, Santos did not know if Jaime struck the blow. Santos believed someone hit him because he awoke on some unidentified morning with pain. Santos testified that Jaime did not owe him anything and he did not know that Jaime used drugs.

13

Santiago Santos denied knowing a person named "Fajardo," and he did not recall ever uttering Fajardo's name. 9 RP at 906. Santos denied carrying a knife and refuted that the bloody knife introduced into evidence belonged to him.

Clinical Psychologist Dr. Philip Barnard served as Santiago Santos's expert in discerning Santos's ability to form the intent to commit the crimes charged. Based on Dr. Barnard's evaluation of Santos, Barnard diagnosed Santos with delusional disorder and alcohol/cannabis abuse disorder. Dr. Barnard also diagnosed a mixed personality disorder with schizoid paranoia and avoidant features. Barnard opined that, as a result of Santos's diminished capacity, Santos could not form the intent necessary to commit the charged offenses. Dr. Barnard avowed:

> I believe that he has been afraid of being attacked, followed, attacked. When he entered the house, Mr. Jamie's [sic] house, that he was struck from behind. So it's like his delusional belief came to fruition and that it happened.
> I think that drove him into a psychotic rage, which was assisted with the disinhibiting factor of the extreme alcohol use so that he stabbed Mr. Jamie [sic] several times trying to defend himself.

9 RP at 950.

Dr. Philip Barnard conceded that another act might have provoked Santiago Santos's psychotic response. Dr. Barnard noted that Santos wore four pairs of boxer shorts at the time of his arrest, "which means to my interpretation that there was some

14

fear of being approached sexually by another individual. He was using [the shorts] as protective gear." 9 RP at 964.

The State called Dr. Robert Fanto, a licensed clinical psychologist employed by the Washington State Office of Forensic Mental Health Services, to rebut the opinions of Dr. Philip Barnard. Dr. Fanto opined that, based on his testing and interview of Santiago Santos, and review of the testing materials and the report issued by Dr. Barnard, and the police reports and medical records, Santos did not suffer from any mental illness at the time of the murder. Fanto testified:

> My opinion was that he had the capacity to form the specific mental element of the crime charged.
> . . . .
> Premeditation, intent to kill.

9 RP at 976. Dr. Fanto commented that, on the night of the murder, Santos engaged in purposeful goal-oriented behavior that suggested he suffered from no major impairments.

Based primarily on Dr. Philip Barnard's testimony, Santiago Santos requested the trial court to instruct the jury on his defense of diminished capacity. The court found that evidence supported instructing the jury on the defense. The trial court gave the following jury instruction:

> Evidence of mental illness or disorder may be taken into consideration in determining whether the defendant had the capacity to form the intent to accomplish a result that constitutes a crime.

15

Clerk's Papers (CP) at 121.

Because the trial court instructed the jury on the defense of diminished capacity,

Santiago Santos also requested a jury instruction that imposed on the State the burden to

disprove beyond a reasonable doubt the defense. Santos argued that any diminished

capacity negated the intent element of murder in the first and second degrees. The trial

court ruled that the State did not bear the burden to disprove the defense, although the

State needed to prove intent. Thus, the court denied Santos's proposed jury instruction.

The trial court delivered a to-convict instruction on first degree murder:

> To convict the defendant of the crime of . . . murder in the first
> degree as charged in count 1, each of the following elements of the crime
> must be proved beyond a reasonable doubt:
> (1) That on or about November 15, 2014 the defendant acted with
> the intent to cause the death of Manuel Ezequiel Jaime;
> (2) That the intent to cause the death was premeditated;
> (3) That Manuel Ezequiel Jaime died as a result of defendant's acts;
> and
> (4) That the acts occurred in the State of Washington.
> If you find from the evidence that each of these elements has been
> proved beyond a reasonable doubt, then it will be your duty to return a
> verdict of guilty.
> On the other hand, if, after weighing all of the evidence, you have a
> reasonable doubt as to any one of these elements, then it will be your duty
> to return a verdict of not guilty.

CP at 124.

The trial court delivered a to-convict instruction on second degree murder:

To convict the defendant of the crime of murder in the second degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
(1) That on or about November 15, 2014 Santiago Santos acted with intent to cause the death of Manuel Jaime;
(2) That Manuel Jaime died as a result of defendant's acts; and
(3) That any of these acts occurred in the State of Washington.
If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
On the other hand, if after weighing all of the evidence you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

CP at 127.

Santiago Santos also asked the trial court to instruct the jury on self-defense. The trial court refused because of a lack of evidence that Santos experienced a reasonable apprehension of being attacked.

At the State's request, the trial court asked the jury to consider the presence of two aggravating factors during the slaying of Manuel Jaime: (1) Santiago Santos engaged in deliberate cruelty and (2) the killing caused a foreseeable and destructive impact on persons other than Jaime. Santos objected, based on insufficient evidence, to the giving of the special verdict forms for the aggravating factors.

The jury convicted Santiago Santos of the lesser offense of first degree manslaughter, rather than first degree murder. The jury also convicted Santos of second

17

degree felony murder. The trial court vacated the manslaughter conviction and sentenced

Santiago Santos on the conviction of second degree murder.

The jury returned special verdicts finding that Santiago Santos committed the

crimes while armed with a deadly weapon. The jury also found two aggravating

circumstances: (1) Santos's conduct manifested deliberate cruelty to the victim, and

(2) the crime involved a destructive and foreseeable impact on persons other than the

victim.

The State of Washington sought an exceptional sentence upward. The trial court

found substantial and compelling reasons to justify an exceptional sentence above the

standard range. The trial court increased Santiago Santos's sentence by ten years. In

total, the trial court sentenced Santos to 398 months in prison. The trial court found

Santos indigent at the time of sentencing, but the court imposed a $200 criminal filing fee

and a $100 DNA collection fee. The trial court also ordered that interest accrue on all

legal financial obligations. The trial court directed Santos to pay the costs of community

custody. The trial court imposed $11,510.79 in restitution and a $500 crime penalty

assessment.

LAW AND ANALYSIS

This opinion constitutes the majority opinion for all sections of the legal analysis,

except section VIII, which concerns the sufficiency of evidence for the destructive and

foreseeable impact on others aggravator. For the majority opinion on section VIII, please refer to Section II of the opinion of Chief Judge Pennell.

I.

Diminished Capacity Jury Instruction

Santiago Santos contends that his diminished capacity defense negated the mental elements in the charged offenses of first degree murder and second degree murder. He thus argues that the trial court erred when rejecting his request to instruct the jury that the State must disprove diminished capacity beyond a reasonable doubt. We only need address this assignment of error with regard to second degree murder, since the jury acquitted Santos of first degree murder. Based on precedent, we disagree with Santos's contention.

Jury instructions, when taken in their entirety, must inform the jury that the State bears the burden of proving every essential element of the crime charged beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *State v. Pirtle*, 127 Wn.2d 628, 656, 904 P.2d 245 (1995). A court commits reversible error when it instructs the jury in a manner that would relieve the State of this burden. *State v. Pirtle*, 127 Wn.2d at 656.

Diminished capacity is a mental condition not amounting to insanity, which prevents an accused from possessing the requisite mens rea necessary to commit the

19

crime charged. *State v. Furman*, 122 Wn.2d 440, 454, 858 P.2d 1092 (1993).

Diminished capacity allows a defendant to undermine a specific element of the offense,

a culpable mental state, by showing that a mental disorder diminished his ability to

entertain that mental state. *State v. Gough*, 53 Wn. App. 619, 622, 768 P.2d 1028 (1989).

Santiago Santos's assignment of error requires this court to determine whether

Washington's "negates analysis" applies to the defense of diminished capacity. On the

one hand, when a defense necessarily negates an element of the crime, the trial court

violates due process by placing the burden of proof of establishing the defense on the

defendant. *State v. W.R., Jr.*, 181 Wn.2d 757, 765, 336 P.3d 1134 (2014). The trial court

must instead instruct the jury that the State carries the burden to disprove the defense

beyond a reasonable doubt. On the other hand, due process does not require the State to

disprove every possible fact that would mitigate or excuse the defendant's culpability.

*Smith v. United States*, 568 U.S. 106, 110, 133 S. Ct. 714, 184 L. Ed. 2d 570 (2013). The

court does not violate a defendant's due process rights when it allocates to the defendant

the burden of proving an affirmative defense when the defense merely excuses conduct

that would otherwise be punishable. *Dixon v. United States*, 548 U.S. 1, 6, 126 S. Ct.

2437, 165 L. Ed. 2d 299 (2006); *State v. W.R., Jr.*, 181 Wn.2d at 762.

The key to whether a defense necessarily negates an element is whether the completed crime and the defense can coexist. *State v. W.R., Jr.*, 181 Wn.2d at 765. If so, the defense merely excuses the conduct, rather than negating the crime. In *State v. W.R., Jr.*, 181 Wn.2d 757 (2014), the court applied the negates analysis to the defense of consent in a rape prosecution because consent necessarily negates forcible compulsion.

Santiago Santos cites no authority that extends the negates analysis to the defense of diminished capacity. Instead, this court rejected the analysis in *State v. James*, 47 Wn. App. 605, 736 P.2d 700 (1987) and *State v. Marchi*, 158 Wn. App. 823, 243 P.3d 556 (2010). In *State v. James*, this court reasoned that the trial court need not instruct the jury that the State has the burden of disproving diminished capacity or intoxication when the court already instructed that the State must prove the requisite mental state beyond a reasonable doubt. In *State v. Marchi*, this court extended the reasoning in *James* to diminished capacity due to mental illness defenses. The *Marchi* court reasoned that diminished capacity is not a complete defense, but is evidence the jury may consider when determining whether the accused could form the requisite mental state to commit the crime. The *Marchi* court also held that the first degree murder elements instructions sufficiently informed the jury of the State's burden of proving the defendant's intent beyond a reasonable doubt.

21

We follow the teaching of *State v. Marchi*. Santiago Santos's trial court properly allocated the State's burden of proof in the "to convict" elements. The trial court further properly instructed the jury that it could consider Santiago Santos's mental illness or disorder when deciding if the State had proven that he acted with the requisite intent. Accordingly, the trial court's jury instructions did not relieve the State of its burden to prove beyond a reasonable doubt that Santos acted intentionally when he stabbed Manuel Jaime to death.

## II.

## Self Defense Jury Instruction

Santiago Santos contends the trial court erred by not instructing the jury on self-defense. He argues the testimony of Dr. Philip Barnard and his own testimony warranted the instruction. We disagree.

Our standard of review for a trial court's refusal to give a jury instruction depends on the basis of the trial court's decision. *State v. Condon*, 182 Wn.2d 307, 315, 343 P.3d 357 (2015). We review the trial court's refusal based on a lack of evidence for an abuse of discretion. *State v. Condon*, 182 Wn.2d at 315-16. If the trial court grounds its refusal on a legal conclusion, we review the refusal de novo. *State v. Condon*, 182 Wn.2d at 315-16. Santiago Santos's trial court refused to instruct the jury on self-defense because no

22

factual evidence showed Santiago Santos was under "reasonable apprehension of great bodily harm." 11 RP at 1049.

The trial court must instruct the jury on each party's theory of the case if sufficient evidence supports that theory. *State v. Williams*, 132 Wn.2d 248, 259, 937 P.2d 1052 (1997). Failure to do so is reversible error. *State v. Griffin*, 100 Wn.2d 417, 420, 670 P.2d 265 (1983). To properly raise the issue of self-defense in a murder prosecution, the defendant must produce some evidence demonstrating that (1) the killing occurred in circumstances amounting to defense of life, and (2) he or she had a reasonable apprehension of great bodily harm and imminent danger. RCW 9A.16.050; *State v. Walker*, 136 Wn.2d 767, 772, 966 P.2d 883 (1998). A person is justified in using deadly force in self-defense only if the person reasonably believes he or she is in imminent danger of death or great personal injury. RCW 9A.16.050(1). Great personal injury is that which would result in "'severe pain and suffering.'" *State v. Walden*, 131 Wn.2d 469, 477, 932 P.2d 1237 (1997) (quoting 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 2.04.01, at 22 (2d ed. 1994)).

In determining whether the evidence suffices to support a jury instruction on an affirmative defense, the court must view the evidence in the light most favorable to the defendant. *State v. O'Dell*, 183 Wn.2d 680, 687-88, 358 P.3d 359 (2015). This standard has both subjective and objective elements. *State v. Walker*, 136 Wn.2d 767, 772 (1998).

23

The subjective element requires the trial court to place itself in the shoes of the defendant and view the defendant's acts in light of all the facts and circumstances known to the defendant. *State v. Walker*, 136 Wn.2d at 772. The objective element requires the trial court to determine what a reasonably prudent person similarly situated would have done. *State v. Walker*, 136 Wn.2d at 772.

Santiago Santos contends that the evidence presented satisfied the low threshold for self-defense instructions. He concedes an incomplete memory of being inside Manuel Jaime's residence, but he argues that the trial court could have inferred he subjectively feared imminent, serious injury due to his delusions.

Santiago Santos produced no evidence demonstrating that he reasonably believed he was in imminent danger of death or great personal injury, let alone in immediate threat by conduct of Manuel Jaime. Santos testified he thought someone hit him on the back of the head, though he did not remember who hit him or any other details. Santos could not recall whether he and Manuel Jaime were involved in any sort of altercation on the night of the murder. He simply woke up with pain and claimed he had a lump on the back of his head.

24

III.

Ketamine Evidence

Santiago Santos next assigns error to the trial court's prohibition of his presenting evidence that homosexual men imbibe ketamine to enhance sexual pleasure. He argues that the trial court denied him his due process right to present a complete defense. The State characterizes any potential evidence of ketamine use as irrelevant, speculative, salacious, and homophobic.

Santiago Santos asks us to apply a de novo standard of review to the trial court's exclusion of testimony regarding ketamine usage among homosexual men because the trial court's ruling implicated his constitutional right to present a complete defense. The State requests that we apply an abuse of discretion standard. We need not address this dispute since, under either standard, we would affirm the trial court.

The United States Constitution and the Washington State Constitution guarantee defendants the right to present a defense. U.S CONST. amends. VI, XIV; WASH. CONST. art. I, § 22; *State v. Wittenbarger*, 124 Wn.2d 467, 474, 880 P.2d 517 (1994). Accordingly, a defendant has a right to present a defense consisting of relevant, not otherwise inadmissible, evidence. *State v. Mee Hui Kim*, 134 Wn. App. 27, 41, 139 P.3d 354 (2006).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. Irrelevant evidence is inadmissible. ER 402. The trial court may deny introduction of relevant evidence if the State can show the evidence is "so prejudicial as to disrupt the fairness of the fact-finding process at trial." *State v. Darden*, 145 Wn.2d 612, 622, 41 P.3d 1189 (2002).

Santiago Santos argued at trial that the excluded testimony would have revealed ketamine's reputation for being used recreationally by men engaging in intercourse with other men. Santos wished to inform the jury that, since Manuel Jaime had ketamine in his system the night of the murder and because the two men were allegedly in Jaime's bedroom, the excluded evidence tended to show a sexual advance by Jaime. Santos argues evidence that homosexual men use ketamine to enhance or tolerate sex supported his theory that Jaime's advance triggered Santos's psychotic break.

We agree with the trial court that no evidence suggested a connection between homosexual activity and Manuel Jaime's murder. Santiago Santos submitted no evidence suggesting that Manuel Jaime attempted to have intercourse with him. In addition, no evidence depicted Jaime as a homosexual man.

IV.

Jail Statements and Video

Hours after Santiago Santos's arrest, Detective Mitchell Fairchild read Santos his *Miranda* warnings at the Grandview police station. Santos then requested to see an attorney. Detective Mitchell ceased questioning and then served and read a warrant for DNA to Santos in its entirety. Santos then commented: "I don't see no signature of no judge on this." Ex. 208 at 2.

Santiago Santos assigns error to the trial court's refusal to suppress the statement he made to law enforcement about the lack of the signature of a judge, which the State provided to the jury by transcript and showed to the jury by videotape. Santos emphasizes that he earlier exercised his right to an attorney. The State responds that, although Santos invoked his right to counsel, the statement uttered to Detective Mitchell Fairchild was spontaneous and thus admissible. The State agrees that Santiago Santos sat in custody when Mitchell Fairchild read him the warrant for the extraction of DNA. We must answer whether the detective's reading and execution of a search warrant constituted interrogation.

This court reviews a trial court's ruling on a motion to suppress evidence in order to determine whether substantial evidence supports the trial court's findings of fact and whether those findings support the court's conclusions of law. *State v. Cherry*, 191 Wn.

App. 456, 464, 362 P.3d 313 (2015).  Santiago Santos's trial court did not enter written findings.  If a trial court did not enter written findings and conclusions after the hearing as required by CrR 3.6(b), the court's oral ruling may still provide sufficient information for review.  *State v. Radka*, 120 Wn. App. 43, 48, 83 P.3d 1038 (2004).  The trial court denied Santos's request to exclude his custodial statement because he uttered the comment without solicitation such that no interrogation occurred.

The federal and state constitutions protect against self-incrimination.  U.S. CONST. amend. V; WASH. CONST. art. I, § 9.  To counteract the coercive pressures of a police dominated atmosphere, the United States Supreme Court adopted the prophylactic rule that police officers must warn a suspect prior to questioning that he or she has the right to remain silent and a right to the presence of an attorney.  *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).  Once the accused expresses his or her desire to deal with the police only through counsel, law enforcement officers may not further interrogate the accused until counsel has been made available to them, unless the accused initiates further communication, exchanges, or conversations with the police.  *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981).

In *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980), the Supreme Court defined interrogation as:

28

not only . . . express questioning, but also . . . any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.

(Footnotes omitted.) Nonetheless, not all interaction qualifies as interrogation and law enforcement officers are not forbidden all contact with a defendant in custody. The Supreme Court expressly exempted from the definition of "interrogation" routine police contact "normally attendant to arrest and custody." *Rhode Island v. Innis*, 446 U.S. at 301. In addition, incriminating statements not responsive to an officer's remarks are not products of interrogation. *In re Personal Restraint of Cross*, 180 Wn.2d 664, 685, 327 P.3d 660 (2014), *abrogated on other grounds by State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018).

Santiago Santos relies on *In re Personal Restraint of Cross*, 180 Wn.2d 664 (2014). Dayva Cross stabbed his wife and the wife's daughters to death. After reading Cross his *Miranda* warnings, one of the officers said to Cross: "Sometimes we do things we normally wouldn't do, and we feel bad about it later." *In re Personal Restraint of Cross*, 180 Wn.2d at 679. Cross responded: "How can you feel good about doing something like this." *In re Personal Restraint of Cross*, 180 Wn.2d at 679. The *Cross* court suppressed Cross's remark because the officer's preceding comment was the "'functional equivalent'" of interrogation. *In re Personal Restraint of Cross*, 180 Wn.2d

29

at 686 (internal quotation marks omitted) (quoting *Rhode Island v. Innis*, 446 U.S. at

301).  The court wrote:

> an officer's comment is designed to elicit an incriminating response
> when a suspect's choice of replies to that comment are all potentially
> incriminating.

*In re Personal Restraint of Cross*, 180 Wn.2d at 686.

Santiago Santos contends the ruling and rationale in *Personal Restraint of Cross*

applies to his interaction with Detective Mitchell Fairchild.  Santos argues that any

response to Fairchild's reading of the DNA search warrant would have been potentially

incriminating.  He reasons that, since the warrant read that the State prosecuted him for

homicide and that Manuel Jaime had died, the detective should have known that reading

the charge to him likely would elicit an incriminating response.

We conclude that the reading of the warrant did not constitute an interrogation.

The presentation and reading of the DNA extraction warrant constituted routine police

contact normally attendant to arrest and custody, not interrogation.  The service of a DNA

search warrant is not reasonably likely to elicit an incriminating response.  In fact, Santos

never made an incriminating response.  He merely stated that he did not see a judge's

signature on the paper, and the State employed his comment not as a confession of guilt

but to establish his ability to cogitate.

No Washington decision directly addresses whether a law enforcement officer's request to obtain a DNA sample from the accused constitutes interrogation. Other jurisdictions, however, have ruled that the request does not constitute interrogation, and these courts have permitted introduction at trial of the accused's comments uttered in response to the request. *United States v. Bustamante*, 493 F.3d 879, 892 (7th Cir. 2007); *Talley v. State*, 2010 Ark. 357, at 4, 377 S.W.3d 222, 224-25; *Everett v. State*, 893 So. 2d 1278, 1286 (Fla. 2004).

V.

Cumulative Error

Santiago Santos argues cumulative error deprived him of a fair trial. The cumulative error doctrine applies when two or more trial errors, none of which standing alone warrants reversal, combine to deny the defendant a fair trial. *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). Without error, the cumulative error doctrine does not apply. *State v. Clark*, 187 Wn.2d 641, 655, 389 P.3d 462 (2017). Because Santiago Santos has not demonstrated any trial errors occurred, we refuse application of the cumulative error doctrine.

31

VI.

Constitutionality of Aggravating Factors

The trial court imposed an exceptional sentence based on two aggravating factors

found by the jury: deliberate cruelty by Santiago Santos and a destructive and foreseeable

impact of the crime. On appeal, Santos argues that insufficient evidence supports each

aggravating factor beyond a reasonable doubt. He also contends that the statutory factors

do not survive a constitutional attack because of their vague standards. We address

Santos's void for vagueness challenge first.

When the defendant's conduct during the commission of the crime manifests

deliberate cruelty to the victim or entails a destructive and foreseeable impact on others,

the trial court may impose an exceptional sentence. RCW 9.94A.535(3)(a) and (r)

declare:

> The court may impose a sentence outside the standard sentence range
> for an offense if it finds, considering the purpose of this chapter, that there
> are substantial and compelling reasons justifying an exceptional sentence.
> Facts supporting aggravated sentences, other than the fact of a prior
> conviction, shall be determined pursuant to the provisions of RCW
> 9.94A.537.
> . . . .
> (3) Aggravating Circumstances—Considered by a Jury—Imposed by
> the Court
> Except for circumstances listed in subsection (2) of this section, the
> following circumstances are an exclusive list of factors that can support a
> sentence above the standard range. Such facts should be determined by
> procedures specified in RCW 9.94A.537.

(a) The defendant's conduct during the commission of the current offense manifested deliberate cruelty to the victim.

. . . .

(r) The offense involved a destructive and foreseeable impact on persons other than the victim.

Santiago Santos emphasizes that the "deliberate cruelty" aggravator permits arbitrary application because all assaults with a deadly weapon that result in death arguably constitute deliberate cruelty. He also argues that the destructive and foreseeable impact aggravator gives the jury an "'inordinate amount of discretion.'" Br. of Appellant (Amended) at 63 (quoting *State v. Myles*, 127 Wn.2d 807, 812, 903 P.2d 979 (1995)). The State responds that this court need not decide Santos's constitutional challenge since he did not raise the challenge before the trial court.

Santiago Santos did not challenge the constitutionality of the aggravating factors as void for vagueness in the trial court. Generally, issues not raised in the trial court may not be raised for the first time on appeal. *State v. Nitsch*, 100 Wn. App. 512, 519, 997 P.2d 1000 (2000). This rule, however, is not an absolute bar to review. *State v. Nitsch*, 100 Wn. App. at 519. Illegal or erroneous sentences may be raised for the first time on appeal. *State v. Nitsch*, 100 Wn. App. at 519. Santiago Santos contends that this constitutional argument is reviewable for the first time on appeal because the contention concerns a manifest constitutional error. RAP 2.5(a)(3).

We follow Washington precedent and reject Santiago Santos's challenge to the constitutionality of the aggravating sentencing factors because the void for vagueness doctrine does not apply to sentencing. The Washington Supreme Court, in *State v. Baldwin*, 150 Wn.2d 448, 459, 78 P.3d 1005 (2003), rejected a void for vagueness challenge to sentencing guidelines statutes because "the due process considerations that underlie the void-for-vagueness doctrine have no application in the context of sentencing guidelines." Sentencing guidelines do not inform the public of the penalties attached to criminal conduct or allow for arbitrary arrest and prosecution. *State v. Baldwin*, 150 Wn.2d at 459. Under *Baldwin*, a defendant is precluded from challenging the sentencing aggravators in RCW 9.94A.535(3) on vagueness grounds. *State v. Brush*, 5 Wn. App. 2d 40, 59, 425 P.3d 545 (2018), *review denied*, 192 Wn.2d 1012, 432 P.3d 792 (2019).

Santiago Santos recognizes *Baldwin* but argues that the decision does not constitute controlling authority after the United States Supreme Court's decision in *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004). The State argues that due process vagueness challenges are not possible even after *Blakely*.

This court addressed an identical issue addressing the "destructive and foreseeable impact" aggravator in *State v. DeVore*, 2 Wn. App. 2d. 651, 413 P.3d 58 (2018). Matthew DeVore challenged the statutory aggravating factor on vagueness grounds and argued that *Baldwin* was no longer valid after *Blakely*. This court analogized DeVore's

34

appeal to *Beckles v. United States*, __U.S. __, 137 S. Ct. 886, 197 L. Ed. 2d 145 (2017).

In *Beckles*, Travis Beckles challenged for vagueness a provision of the federal sentencing

guidelines. The guidelines include a clause defining a "crime of violence." *Beckles v.*

*United States*, 137 S. Ct. at 890-91. A person convicted of a crime that qualifies as a

crime of violence is eligible for a sentence enhancement under the federal guidelines.

The *Beckles* court held that vagueness concerns apply to laws that define criminal

offenses and that "fix the permissible range of sentences." 137 S. Ct. at 892.

Accordingly, the court concluded the guidelines are not subject to a vagueness challenge

under the due process clause.

This court in *DeVore* considered Matthew DeVore's appeal akin to *Beckles*. This

court observed that the destructive impact factor does not increase the permissible

sentence of the offender. The trial court must still sentence the defendant within the

statutory maximum of the crime. Therefore, this court held that challenges to the

destructive impact factor and other aggravating factors under RCW 9.94.A.535(3) do not

merit review under the void for vagueness doctrine. *State v. DeVore*, 2 Wn. App. 2d at

665.

Santiago Santos acknowledges the implications of both *DeVore* and *Beckles*, but

he argues that our state Supreme Court's recent decision in *State v. Allen*, 192 Wn.2d 526,

431 P.3d 117 (2018) held statutory aggravators in RCW 9.94A.535(3) subject to void for

vagueness challenges. We distinguish *Allen*. The *Allen* court addressed whether the aggravating circumstances listed in RCW 10.95.020 constituted "elements" of the offense of aggravated first degree murder for purposes of the double jeopardy clause. The court concluded that those aggravating circumstances under RCW 10.95.020 "increase the mandatory minimum penalty for first degree murder," not the standard range as is the case with the aggravators Santos challenges. *State v. Allen*, 192 Wn.2d at 534. *Allen* does not change the rule precluding a vagueness challenge to the statutory aggravators set out in RCW 9.94A.535(3).

## VII.

### Sufficiency of Evidence for Deliberate Cruelty Aggravator

We now address the sufficiency of evidence of each aggravating factor beginning with deliberate cruelty by Santiago Santos. Santos argues that insufficient evidence supports each aggravating factor beyond a reasonable doubt.

In *Blakely v. Washington*, 542 U.S. 296 (2004), the United States Supreme Court ruled that, for an exceptional sentence to be constitutional, the State must prove the facts supporting aggravating factors to a jury beyond a reasonable doubt. *See also* RCW 9.94A.537(3). This court uses the same standard of review for the sufficiency of the evidence of an aggravating factor as it uses for the sufficiency of the evidence of the elements of a crime. *State v. Yarbrough*, 151 Wn. App. 66, 96, 210 P.3d 1029 (2009).

36

Under this standard, this court reviews the evidence in the light most favorable to the

State to determine "whether any rational trier of fact could have found the presence of the

aggravating circumstances beyond a reasonable doubt." *State v. Zigan*, 166 Wn. App.

597, 601-02, 270 P.3d 625 (2012). All reasonable inferences from the evidence must be

drawn in favor of the State and interpreted most strongly against the defendant. *State v.

Hosier*, 157 Wn.2d 1, 8, 133 P.3d 936 (2006).

When the defendant's conduct during the commission of the crime manifests

deliberate cruelty to the victim, the trial court may impose an exceptional sentence.

RCW 9.94A.535(3)(a).

> Deliberate cruelty consists of gratuitous violence or other conduct
> that inflicts physical, psychological, or emotional pain as an end in itself.
> To justify an exceptional sentence, the cruelty must go beyond that
> normally associated with the commission of the charged offense or inherent
> in the elements of the offense—elements of the crime that were already
> contemplated by the legislature in establishing the standard range.

*State v. Tili*, 148 Wn.2d 350, 369, 60 P.3d 1192 (2003) (internal citations omitted). The

gratuitous infliction of multiple wounds to a murder victim is a basis for an exceptional

sentence based on deliberate cruelty. *State v. Ross*, 71 Wn. App. 556, 562-63, 861 P.2d

473 (1993) (over 100 separate stab wounds, cuts, and marks); *State v. Harmon*, 50 Wn.

App. 755, 760-61, 750 P.2d 664 (1988) (64 knife wounds).

We find *State v. Campas*, 59 Wn. App. 561, 799 P.2d 744 (1990) helpful.  The

*Campas* court affirmed the deliberate cruelty aggravator because the record supported the

finding that the "defendant killed Thomas in a deliberately cruel manner by repeated

bludgeoning and stabbing, which left her barely alive but in pain and agony until she

died."  *State v. Campas*, 59 Wn. App. at 566.

Santiago Santos stabbed Manuel Jaime in the chest, the flanks, the back, and the

head 59 times.  Santos then taunted Jaime as he helplessly bled to death.  Santos left

Jaime barely alive but in pain until he died at the hospital.  Thus, the State proved the

existence of "deliberate cruelty" beyond a reasonable doubt.

Santiago Santos argues, without citation to authority, that the State needed to

introduce testimony or documentary evidence setting forth facts of other murder cases

showing other homicides to be significantly less egregious.  This court does not review

errors not briefed or supported with citation to authority.  RAP 10.3; *Valente v. Bailey*,

74 Wn.2d 857, 858, 447 P.2d 589 (1968); *Meeks v. Meeks*, 61 Wn.2d 697, 698, 379 P.2d

982 (1963); *Avellaneda v. State*, 167 Wn. App. 474, 485 n.5, 273 P.3d 477 (2012).

VIII.

Sufficiency of Evidence of Destructive and Foreseeable Impact on Others

This section of the opinion regarding a destructive and foreseeable impact on

others constitutes the minority opinion.  The majority on this issue holds that the State

presented sufficient evidence for this aggravator. I dissent.

RCW 9.94A.535(3)(r) applies when the jury finds "a destructive and foreseeable impact on persons other than the victim." An exceptional sentence based on a foreseeable and destructive impact requires an impact foreseeable to the defendant and of such a destructive nature that is not normally associated with the commission of the offense in question. *State v. Webb*, 162 Wn. App. 195, 206, 252 P.3d 424 (2011).

Santiago Santos argues three points. First, the evidence did not establish foreseeability by Santos that children were present. Second, the evidence did not establish the destructive nature of the offense. And last, the trial court improperly instructed the jury on the destructive and foreseeable impact aggravator. I agree with Santos's second contention.

The State contends that, although Santiago Santos challenged the factual basis of these aggravators in the trial court, he has not explained why this court should consider this issue for the first time on appeal. Because Santos objected to giving the special verdict forms based on insufficient evidence, I review this assignment of error.

Reviewing the evidence in the light most favorable to the State, sufficient evidence supports the foreseeability requirement. A rational trier of fact could have found the crime to have a foreseeable impact on persons other than Manuel Jaime. Santiago Santos recalled seeing children playing in the yard of Jaime's home. He conceded that he knew

39

children resided there. The stabbing occurred around 3:00 a.m. If Santos knew children lived in the house, he likely knew children would be present during the night. Andrew Fernandez also heard Santos say "I'm going to come back for your family," which indicates Santos knew Jaime's family members were present. 5 RP at 383. Thus, Santos knew of and should have known that children present would be traumatized by his actions.

Santiago Santos relies primarily on *State v. Webb*, 162 Wn. App. 195, 252 P.3d 424 (2011) when arguing the lack of a destructive impact on others, including the children in the Grandview residence. In *State v. Webb*, Daniel Webb took his nine-year-old daughter with him when he robbed a minimart with a phony gun. On appeal, he argued insufficiency of the evidence to establish that the robbery involved a destructive and foreseeable impact on his daughter. The court reasoned that the evidence provided descriptions of the girl and her behavior around the time of the robbery, but failed to show, beyond a reasonable doubt, a lasting destructive impact. The State provided no testimony from a relative, school counselor, or other person about any impact left by witnessing the robbery. The court distinguished its facts from other decisions wherein evidence revealed a destructive impact observable after the crime occurred. I do not know for how long after the crime that the impact must remain observable.

Andrew Fernandez heard Manuel Jaime crying and heard Santiago Santos say, "you're dying slowly." 5 RP at 383. Andrew testified that he was frightened and knew everyone in the house faced danger. Andrew's aunt, Alma Guillen, testified that, when she arrived at the police station to gather her daughter, her daughter was distraught. Guillen also testified to her and others encountering difficulty returning to the home.

While the trial evidence showed that the killing traumatized Andrew Fernandez and at least one other child at the time of the slaying, no evidence established, beyond a reasonable doubt, a lasting destructive impact on Andrew or others. Alma Guillen testified to difficulty returning to the home, but she did not identify at what time she and others returned to the home and whether the difficulty continued beyond the day of the killing. When police later interviewed Andrew Fernandez, a school counselor accompanied him but, by that time, Andrew had calmed down. The school counselor did not appear at court to testify to a durable impact. One might expect young children to be traumatized for years after being near a murder and after being worried about their own lives, but the State provided no durable and impactful evidence of a destructive impact.

Because I would reverse on the insufficiency of evidence, I do not address Santiago Santos's other assertion that the court improperly instructed the jury on the destructive and foreseeable impact aggravator.

41

IX.

Filing Fee

Santiago Santos argues that imposition by the sentencing court of a $200 criminal filing fee, costs of community custody, and interest on legal financial obligations must be struck pursuant to *State v. Ramirez*, 191 Wn.2d 732, 426 P.3d 714 (2018).  We agree that, because of Santos's indigency, the filing fee should be struck.  RCW 36.18.020(2)(h).  In addition, the legislature has eliminated interest accrual on the nonrestitution portions of legal financial obligations.  RCW 10.82.090(1).  Therefore, the interest accrual provision must also be struck.  Finally, Santos argues that the costs of community custody are discretionary and are subject to an ability to pay inquiry under *State v. Lundstrom*, 6 Wn. App. 2d 388, 396 n.3, 429 P.3d 1116 (2018), *review denied*, 193 Wn.2d 1007, 443 P.3d 800 (2019).  We agree.

The State concedes these financial obligations, as well as the $100 DNA collection fee, should be struck, but and asserts this case need not be remanded for the amendment of the judgment and sentence because the State may file an amended judgment.  We discern no difference between the State filing an amended judgment and our directing the sentencing court to strike the offending legal financial obligations, particularly because we rule that Santiago Santos need not be present during any remand hearing.  *State v. Ramos*, 171 Wn.2d 46, 48, 246 P.3d 811 (2011).  Thus, we remand for the sentencing

court to strike the criminal filing fee, costs of community custody, the DNA extraction

fee, and interest on legal financial obligations.

## X.

### Statement of Additional Grounds for Review

Santiago Santos filed a statement of additional grounds for review, but the

statement does not raise any issues beyond issues raised by appellate defense counsel.

Accordingly, we decline entertainment of his statement.

## CONCLUSIONS

We affirm Santiago Santos's conviction for second degree murder. We remand

for the sentencing court to strike the offending financial obligations.

A majority of the panel has determined this opinion will not be printed in

the Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_Fearing, J._
Fearing, J.

I CONCUR as to all but Section VIII:

_Siddoway, J._
Siddoway, J.

No. 36069-5-III

PENNELL, C.J. (writing for the majority and in dissent) — I disagree with the

majority's aggravating factors analysis. Contrary to the majority and our prior decision in

*State v. DeVore*, 2 Wn. App. 2d 651, 413 P.3d 58 (2018), I believe Washington's

sentencing guidelines are theoretically amenable to a vagueness challenge. Nevertheless,

the challenge here fails on the merits. I also believe the State presented sufficient

evidence to justify a sentence aggravator based on "a destructive and foreseeable impact

on persons other than the victim." RCW 9.94A.535(3)(r). I would therefore affirm the

custody portion of Santiago Santos's sentence in full and merely remand to strike the

$200 criminal filing fee and $100 DNA (deoxyribonucleic acid) fee.

I.

*Aggravating factors are amenable to a vagueness challenge*

Due process prohibits depriving an individual of liberty or property based on a

vague law. A law can be vague in two ways: (1) it can fail to provide fair notice and

(2) it can be "so standardless that it invites arbitrary enforcement." *Johnson v. United*

*States*, __ U.S.__, 135 S. Ct. 2551, 2556, 192 L. Ed. 2d 569 (2015). Vagueness principles

apply both to statutes defining elements of crimes" and "to statutes fixing sentences."

*Id*. at 2557. A statute that fixes a sentence need not be one that eliminates all judicial

discretion. Instead, it can permit courts to enhance the maximum penalty, the minimum

penalty, or both. *See Beckles v. United States*, __ U.S. __, 137 S. Ct. 886, 892, 197 L. Ed. 2d 145 (2017) (explaining "'statutes fixing sentences'" may "specify the range of available sentences[,]" but must do so with "'sufficient clarity'") (quoting *Johnson*, 135 S. Ct. at 2557; *United States v. Batchelder*, 442 U.S. 114, 123, 995 S. Ct. 2198, 60 L. Ed. 2d 755 (1979)); *Alleyne v. United States*, 570 U.S. 99, 112, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013) ("a fact increasing either end of the range produces a new penalty and constitutes an ingredient of the offense").

In *State v. Baldwin*, 150 Wn.2d 448, 459, 78 P.3d 1005 (2003), our Supreme Court rejected the possibility of a vagueness challenge to Washington's sentencing guidelines. In essence, the court held that factors relevant to calculating the guidelines are not akin to criminal elements and they do not fix particular sentences. The court emphasized that Washington's sentencing guidelines are merely discretionary. "The guidelines are intended only to structure discretionary decisions affecting sentences; they do not specify that a particular sentence must be imposed." *Id.* at 461. Given this nonbinding nature, the court reasoned that sentencing guidelines do not "create a constitutionally protected liberty interest" that can be attacked through a vagueness challenge. *Id.* at 460.

In *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), the United States Supreme Court upended *Baldwin*'s understanding of the state guidelines. *Blakely* held that Washington's statutory guideline scheme is not merely

advisory. *Id.* at 304. Instead, a defendant has a right to a standard range sentence unless there are additional facts beyond those necessary for a conviction to justify a sentence aggravator. *Id. Blakely* explained that because the facts necessary to justify a sentence aggravator enhance the "statutory maximum of the standard range," they must either be admitted by the defendant or proven to a jury. *Id.* at 303-04. The upshot of *Blakely* is that under Washington law, a sentence aggravator not only fixes a defendant's maximum punishment, it is like a criminal element and must be afforded the same protections under the Sixth Amendment to the United States Constitution. *See Alleyne*, 570 U.S. at 103 ("Any fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt.").

*Blakley* identified two methods states could use to bring their sentencing schemes into compliance with the Sixth Amendment: (1) adopt an indeterminate sentencing scheme giving judges broad discretion to impose sentences up to the statutory maxima or (2) retain nonadvisory sentencing guidelines, but assign juries the responsibility of determining guideline factors. *Blakely*, 542 U.S. at 309-10. In 2005, Washington chose the latter course. *See* LAWS OF 2005, ch. 68, § 1. As the law now stands, a defendant has a right to a sentence within the standard range affixed to a particular crime of conviction unless a jury finds one or more statutory aggravating factors beyond a reasonable doubt. RCW 9.94A.537(3).

No. 36069-5-III
*State v. Santos* (Dissent)


Our Supreme Court has not revisited *Baldwin* post-*Blakely*.[1] As a conceptual

matter, the analysis would seem straightforward. Because it is now clear a defendant *does*

have a vested right to a standard range sentence unless an aggravator is proved to a jury

beyond a reasonable doubt, due process should require that aggravators presented to a

jury not be vague. This is the approach taken with other statutory enhancements. *See State

v. Coria*, 120 Wn.2d 156, 161-62, 839 P.2d 890 (1992) (applying a vagueness analysis to

a school bus enhancement); *Johnson*, 135 S. Ct. at 2557 (analyzing a federal statutory

enhancement for vagueness). There is no reason why the same approach should not apply

to the guidelines.[2]

---

[1] The Supreme Court declined to reach the issue in *State v. Duncalf*, 177 Wn.2d 289, 296, 300 P.3d 352 (2013) and instead denied the defendant's vagueness challenge on the merits.

[2] While application of an aggravating circumstance under RCW 9.94A.535(3) does not alter a defendant's minimum sentence or require a specific sentence, it still serves to fix a defendant's sentencing range and, as a result, impacts the defendant's vested interests. Here, for example, Mr. Santos had a vested interest in the maximum of his statutory range of 178-278 months unless the State proved an aggravator beyond a reasonable doubt. Once the aggravator was proven, the sentencing range available to the court was enhanced to 178 months to life. This is a sentencing enhancement akin to the enhancements addressed in *Coria*, 120 Wn.2d at 166-67 (school bus stop enhancement) and *Johnsons*, 135 S. Ct. at 2555-56 (Armed Career Criminal Act enhancement). Accordingly, due process requires that the aggravating factors used to elevate Mr. Santos's maximum term of imprisonment survive a vagueness challenge.

47

Despite this conceptual clarity, the Washington Court of Appeals continues to follow *Baldwin*. *See State v. Brush*, 5 Wn. App. 2d 40, 44, 425 P.3d 545 (2018); *Devore*, 2 Wn. App. 2d at 660-64. Our analysis has largely been based on the United States Supreme Court's 2017 decision in *Beckles v. United States*. This reliance on *Beckles* is misguided.

*Beckles* was decided in the wake of Supreme Court cases such as *Johnson*, applying vagueness scrutiny to federal sentencing enhancements. *Beckles* held a vagueness challenge is not viable in the unique context of the federal sentencing guidelines. 137 S. Ct. at 890. The federal guidelines are dissimilar to Washington's guidelines in that they are purely advisory. *See id.* at 894. The federal guidelines serve merely to guide a judge's broad sentencing discretion. *Id*. The guidelines do not need to be followed. Instead, federal judges have discretion to impose sentences either above or below the suggested guideline range without any need for jury fact-finding. *Id*. at 895. Because the federal guidelines do not set any enforceable minimum or maximum term of imprisonment, a defendant has no vested interest in a particular sentencing guideline range. According to *Beckles*, this means a defendant cannot assert a vagueness challenge to the factors used to establish the federal range. *Id.* at 894.

Because sentencing factors in Washington have the force of law and are constitutionally akin to elements, *Beckles* is inapplicable. Instead of *Beckles*, Washington's sentencing statutes should be judged under the vagueness standard generally applicable to statutory sentencing enhancements.

*The aggravating factors are not vague as applied here*

Going to the merits, a vagueness challenge must be reviewed according to the specific circumstances of the defendant's case. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-19, 130 S. Ct. 2705, 177 L. Ed. 2d 355 (2010); *State v. Schilling*, 9 Wn. App. 2d 115, 118-21, 442 P.3d 262 (2019). The question is "whether a person of reasonable understanding is required to guess" that the defendant's conduct met the terms of the statute. *State v. Duncalf*, 177 Wn.2d 289, 297, 300 P.3d 352 (2013).

Mr. Santos's jury found two statutory sentencing aggravators. Each aggravator must be assessed for vagueness.

*1. RCW 9.94A.535(3)(a)*

The jury's first aggravator was under RCW 9.94A.535(3)(a), which applies when "[t]he defendant's conduct during the commission of the current offense manifested deliberate cruelty to the victim."

The trial court's instructions to the jury provided the following definition of deliberate cruelty:

> "Deliberate cruelty" means gratuitous violence or other conduct which inflicts physical, psychological, or emotional pain as an end in itself, and which goes beyond what is inherent in the elements of the crime or is normally associated with the commission of the crime.

Clerk's Papers at 144.

According to Mr. Santos, the foregoing definition did not provide the jury with a sufficient framework for assessing the applicability of a deliberate cruelty aggravator. Specifically, the jury was not advised of the types of harm inherent to or typical of murder. Thus, he claims that the jury's assessment of the aggravator was standardless and arbitrary. I disagree. The crime of murder is well understood in American culture. No guesswork or speculation is required to determine that stabbing someone 59 times is excessive and therefore more violent or egregious than a standard homicide. *Cf. Johnson*, 135 S. Ct. at 2557 (holding statute asking courts to determine whether a normally nonviolent crime nevertheless generally creates a serious risk of injury denies fair notice and is too standardless to survive a vagueness challenge). As applied to Mr. Santos's case, RCW 9.94A.535(3)(a) is not impermissibly vague.

### 2. RCW 9.94A.535(3)(r)

The jury's second aggravator was under RCW 9.94A.535(3)(r), which allows for an enhancement if "[t]he offense involved a destructive and foreseeable impact on persons other than the victim."

The trial court did not provide an instruction defining destructive and foreseeable impact; nevertheless, that factor withstands Mr. Santos's vagueness challenge. The facts at trial made clear the jury was asked two things by RCW 9.94A.535(3)(r):

1. Was Mr. Santos on notice that third parties (such as the children who lived with the victim, Manuel Jaime) might have witnessed his criminal conduct?

2. Did witnessing the murder cause a third person to suffer a destructive impact?

These two questions are precise and readily answerable in a nonarbitrary manner. A person of reasonable understanding would not have to guess that murdering someone in the presence of a child could result in an enhanced sentence under RCW 9.94A.535(3)(r). Mr. Santos's vagueness challenge therefore fails.

II.

*The State presented sufficient evidence to justify its aggravators*

Separate from his vagueness argument, Mr. Santos contends the State presented insufficient evidence to justify an impact on others enhancement under RCW 9.94A.535(3)(r). Relying on *State v. Webb*, 162 Wn. App. 195, 252 P.3d 424 (2011), Mr. Santos claims the State failed to prove the minimum facts necessary for the enhancement because there was no evidence of a destructive impact on a third person that was "observable *after* the crime occurred." *Id*. at 207.

51

*Webb* is inapt because the facts in *Webb* differ materially from those here. The defendant in *Webb* was convicted of first degree robbery and reckless endangerment after he robbed a minimart in the presence of his nine-year-old daughter. *Id*. The daughter did not testify at trial. *Id*. The only evidence of the crime's impact on the daughter came from witnesses who saw her around the time of the offense. *Id*. at 207-08. Because there was no evidence of any observations of the daughter after the commission of the crime, this court determined the State's proof was insufficient to show a "lasting destructive impact." *Id*. at 208.

Unlike *Webb*, the jury in Mr. Santos's case was provided evidence relevant to whether a third person exhibited an observable destructive impact subsequent to the commission of the crime. The third party at issue in Mr. Santos's case—the boy who observed the murder—testified at trial. The jury was able to observe the boy's demeanor during his testimony and discern for itself whether there was a destructive impact. Although the boy was not asked to articulate his specific feelings of trauma, deference to the jury's verdict is nevertheless appropriate.

Because the jury was presented with sufficient evidence that Santiago Santos was on notice that children lived at Manuel Jaime's house (and therefore likely would be present at the time of the murder) and because the murder was witnessed by a third party who described his observations at trial and subjected his demeanor to the jury's scrutiny,

the enhancement under RCW 9.94A.535(3)(r) must be affirmed. We do not address the

wording of the instruction, as that issue has not been preserved. RAP 2.5(a); *State v.*

*Gordon*, 172 Wn.2d 671, 679, 260 P.3d 884 (2011) (failure to provide definitional

instruction on aggravating factor not constitutional error).

_____, C.J.
Pennell, C.J.

I CONCUR as to Section II:

_____
Siddoway, J.